2009 ME 96

Igor MALENKO

v.

Lori HANDRAHAN.

Supreme Judicial Court of Maine.

Submitted on Briefs: July 29, 2009.

Decided: Sept. 1, 2009.

District Court (Portland, *Moskowitz, J.*), contending that the judgment's relocation provision that transfers primary custody of the parties' daughter if Handrahan relocates from Maine violates Maine statutes and is unconstitutional, that the court erred by excluding expert testimony, and that the court's credibility findings are erroneous. We modify the judgment by striking the automatic relocation provision and, as modified, affirm the judgment.

## I. CASE HISTORY

[¶ 2] Lori Handrahan and Igor Malenko met in May 2005 in Macedonia, Malenko's birthplace, and continued their relationship in Holland, where Malenko resided. In early 2006, they moved to the United States and then married, and their daughter was born later that year.

[¶ 3] Malenko is thirty-seven years old. While residing in Holland, he attended a technical college, but did not graduate. He is currently employed as a laboratory technician and is attending classes to obtain a degree in biotechnology. Handrahan is forty years old. In 2001, she obtained a Ph.D. in Sociology from the London School of Economics and Political Science, and she currently works as a Senior Gender Advisor for CARE International.

[¶ 4] Malenko filed for divorce in May 2008 and a guardian ad litem was appointed. The final hearing was held over two days in December 2008. The primary issue at the hearing involved parental rights and responsibilities relating to the daughter. This issue was hotly contested and focused on Handrahan's allegations that Malenko suffers from a serious mental illness, is violent and abusive, and poses a significant risk to the daughter's well-being.

Kenneth P. Altshuler, Esq., Childs, Rundlett, Fifield, Shumway & Altshuler, Portland, ME, Michael M. Godsy, Esq., Sonnenschein Nath & Rosenthal, LLP, St. Louis, MO, Joan S. Meier, Esq., DV Leap, Washington, DC, for Lori Handrahan.

Michael J. Waxman, Esq., Portland, ME, for Igor Malenko.

Todd S. Holbrook, Esq., Morgan, Lewis & Bockius, LLP, Boston, MA, David A. Sirignano, Esq., Washington, DC, for amici curiae.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1] This is a highly contested child custody case. Lori Handrahan appeals from a judgment of divorce entered in the

[¶ 5] Handrahan alleged that Malenko had engaged in at least five incidents of violent and abusive conduct: (1) a head-butting incident that occurred when Malenko was in high school, long before the parties met; (2) an incident when Malenko threw hot chicken at Handrahan when she was pregnant; (3) an incident when Malenko threw a sweater that hit Handrahan and their daughter while Handrahan was nursing their daughter; (4) an incident when Malenko slapped Handrahan's hand while she was nursing their daughter; and (5) an incident when Malenko threw a jar of peanut butter at Handrahan, striking her head. Handrahan also asserted that Malenko had weekly "rage attacks" in which he directed abusive language at her. Malenko did not deny that the incidents occurred, except for the chicken-throwing incident, but alleged that Handrahan had exaggerated and mischaracterized them.[1]

[¶ 6] During the marriage, Handrahan became convinced that Malenko was suffering from Post–Traumatic Stress Disorder (PTSD), and she insisted that he seek mental health treatment. Malenko complied and was evaluated by several providers, but none of the evaluators found him to be suffering from a mental illness. Despite the evaluations, Handrahan insisted that Malenko take medications that she had researched, and she unsuccessfully attempted to have Malenko designate her as his health care power of attorney and to have Malenko involuntarily committed.

[¶ 7] In the summer of 2008, Dr. Carol Lynn Kabacoff, a clinical psychologist, evaluated Malenko and Handrahan at the request of the guardian ad litem. Kabacoff submitted a comprehensive parental capacity evaluation that found, among other things, that Malenko was not mentally ill. Kabacoff also noted that Handrahan's efforts to have Malenko diagnosed with a mental illness had led several providers to suggest that Handrahan herself seek mental health counseling. She concluded, "Further assessment of Mr. Malenko's mental health is not only unnecessary but the request for such may be seen as emotionally abusive."

[¶ 8] At the hearing, Kabacoff testified as to her evaluation of the parties, as well as to her opinion regarding a forensic report prepared by Handrahan's domestic violence expert, Lesley Devoe, L.C.S.W. that concluded that Malenko posed a substantial risk of harm to Handrahan and the daughter. Kabacoff testified that Devoe's report was unreliable because, among other things, Devoe did not meet Malenko, and Devoe placed great weight on only one test, a danger assessment questionnaire completed by Handrahan and administered by Dr. Jacqueline Campbell, a researcher and clinician in the area of domestic violence.

[¶ 9] Devoe, who specializes in domestic abuse issues, testified at length regarding the basis for her opinion that Handrahan was a victim of domestic abuse perpetrated by Malenko, and that Malenko posed a risk of harm to both Handrahan and the daughter. Devoe took issue with the mental health paradigm that, she believed, the guardian ad litem and Dr. Kabacoff had employed. Devoe testified that she has trained judges, guardians, mental health professionals, and others on domestic violence, and she is writing a book "on how batterers ma-

1. For example, with respect to the alleged incident involving the jar of peanut butter, Malenko testified that in the midst of a heated verbal argument with Handrahan, he swept his hand across the kitchen table striking an empty plastic jar of peanut butter that landed between the fridge and the wall, that the jar was not thrown, and that it did not strike Handrahan.

nipulate mental health and legal professionals." She testified that because domestic abuse is different from mental health and medical issues, a domestic violence paradigm focusing on issues of coercive control, financial exploitation, emotional abuse, and other forms of abuse must be applied. Devoe explained that this was a particularly difficult case because Handrahan is a successful and assertive woman, and that "one of the myths [regarding domestic violence] is that battered women are compliant, they're downtrodden, they're really ... not angry." She continued, "Mental health professionals are known for not liking angry women."

[¶ 10] At the outset of the trial, the court denied Handrahan's motion to permit her additional expert witness, Dr. Leslie Drozd, a clinical psychologist who specializes in child custody evaluations, to testify by telephone or to permit Dr. Campbell to testify as a rebuttal witness by telephone. As a consequence, the court did not receive the testimony of either witness.

[¶ 11] The guardian ad litem submitted two reports. In the first report, the guardian concluded that the episodes of domestic violence were attributable to "situational couple violence" arising from conflicts in the marriage, as opposed to "coercive controlling violence," which is characterized by power and control and often results in serious injuries. She wrote: "While I do not believe Lori is being intentionally misleading, I believe that her experience and perceptions are not the experience and perceptions that others may have of the same event." The

guardian also observed, "This is not a typical domestic violence situation, in that the person with the power and control in the relationship was clearly [Handrahan, and that h]er actions in this case are not consistent with those of a battered wife." The guardian also reported that "[t]here is no evidence of [Malenko] being dangerous, abusive or even inappropriate with any child, let alone [his daughter]."

[¶ 12] Although the guardian recommended that the parties have shared parental rights and responsibilities with the child's primary residence assigned to Handrahan, the guardian expressed reservations about this arrangement, citing Handrahan's tendency to misperceive events, her unwillingness to consider views different from her own, and her reluctance to promote a relationship between the daughter and Malenko. The guardian also reported that Malenko's anxiety and his over-protectiveness of the daughter were "barriers to confidence in his abilities as a residential parent," and that "[h]is behavior is at times hard to understand." Accordingly, the guardian recommended that Malenko's rights of parent/child contact be subject to a graduated schedule during which Malenko could "demonstrate his ability to adapt and parent [the daughter] outside of [Handrahan's] control and ... supervision."[2] The guardian's recommendation that the contact schedule gradually increase was conditioned on Malenko securing a two-bedroom residence, and the assumption that the visits were "going well" and without "significant problems."

[¶ 13] In the second report, which was written after the guardian learned that Handrahan intended to relocate to Wash-

**2.** The graduated schedule of parent/child contact, which was ultimately adopted by the court, began with three days per week between the hours of 9:00 a.m. and 5:00 p.m. for six months, increasing to one overnight and one or two daytime visits for three months, increasing to two overnights and one daytime visit each week for three months, followed by three overnights each week once the child was three years old.

ington, D.C., as desired by her employer, the guardian concluded that primary custody should be granted to Malenko if Handrahan relocated. The guardian premised her recommendation on a variety of factors, including the adverse effect a disrupted parent/child relationship would have on the daughter's developmental needs, and her expectation "that a relocation of the child would effectively sever the child's relationship with her father" based on her belief that Handrahan was not willing to facilitate the relationship.

[¶ 14] The court's findings summarized the parties' conflicting versions of the five instances of domestic violence alleged by Handrahan, and Handrahan's "unwavering belief" that Malenko is mentally ill and incompetent, including two resulting instances, which the court described as "bizarre," in which Handrahan summoned a medical team and an ambulance to come to their residence. In awarding parental rights and responsibilities, the court's findings and conclusions are largely consistent with the opinions and testimony of the guardian ad litem and Kabacoff. The court found Kabacoff's testimony "very credible" and that "[h]er findings [were] corroborated by the fact that other mental health professionals have made similar findings regarding" Malenko and were further supported by Handrahan's "behavior and by her testimony at trial."

[¶ 15] The court concluded that Malenko's testimony was credible while Handrahan's was not:

The court finds [Malenko's] testimony credible. His demeanor while testifying appeared appropriate and many of his assertions are corroborated by other evidence. On the other hand, the court does not find [Handrahan's] testimony to be very credible. This may be related to the observation made by both Dr. Kabacoff and the Guardian that [Handrahan] seems to perceive events differently than others. In any event, [Handrahan] maintained a very defensive demeanor while she testified, and her answers, particularly on cross-examination, indicated a lack of candor. Additionally, some of [Handrahan's] assertions are refuted by other evidence.

[¶ 16] The judgment ordered shared parental rights and responsibilities and granted Handrahan primary residence of the daughter, but also ordered primary residence to be transferred to Malenko in the event that Handrahan relocated out of state as she intended:

B. **Primary physical residence.** Primary physical residence of [the daughter] is allocated to [Handrahan]. There was some indication made at trial that [Handrahan] may intend to relocate to the Washington, D.C. area in a job-related move. The court finds that it is in the best interest of [the daughter] that she has frequent and continuing contact with both of her parents. Therefore, primary physical residence of [the daughter] is allocated to [Handrahan] provided she remains in the State of Maine. If [Handrahan] does in fact relocate out of state, primary physical residence of [the daughter] shall be granted to [Malenko].

The judgment also included a separate provision requiring thirty days' prior notice of any intended relocation of the child's residence, as required by 19–A M.R.S. § 1653(14) (2008).[3]

---

**3.** The judgment provided:

G. **Relocation of Children.** A parent who intends to relocate [the child's] residence must provide the other parent prior notice at least 30 days before the intended relocation. If the relocation must occur in less than 30 days, the parent who is relocating shall provide notice as soon as possible

[¶ 17] In addition, the court ordered the parties to receive continuing psychological treatment. The court ordered Malenko to engage in biweekly individual counseling sessions, and ordered Handrahan to participate in dialectical behavioral therapy directed at developing more effective cooperation and co-parenting skills.

[¶ 18] Neither party filed a motion for further findings of fact and conclusions of law. Handrahan subsequently filed this appeal. We granted permission to a coalition of individuals and organizations concerned with domestic violence to appear as amici curiae and file a brief.[4]

## II. DISCUSSION

[¶ 19] Handrahan contends that: (A) the judgment's relocation provision that automatically transfers primary residence of the daughter should Handrahan relocate violates Maine statutes and is unconstitutional; (B) the court erred by excluding the telephonic testimony of her expert and rebuttal witnesses; and (C) the court's credibility findings are erroneous.

### A. Parental Relocation and an Automatic Transfer of Residential Care

 [¶ 20] Handrahan contends that the relocation provision transferring primary custody of the daughter from Handrahan to Malenko violates Maine law because it determines the daughter's best interests prospectively and is temporally indefinite. She also asserts that the relocation provision is unconstitutional because

it infringes on her right to travel, right to family integrity, and right to privacy. Malenko responds that Handrahan has misconstrued the divorce judgment because the divorce judgment only awards him primary residence if Handrahan had moved from Maine as of the date of the issuance of the judgment, and is no longer effective because Handrahan had not relocated from Maine as of that date. He asserts that the court could not have intended the provision to apply beyond the date of the judgment, contending that the court lacks authority to "establish a forward looking, self-executing and temporally indefinite determination regarding primary residence and relocation."

 [¶ 21] Our review of questions of law, including alleged constitutional violations and statutory interpretation, is de novo. *In re Robert S.*, 2009 ME 18, ¶ 12, 966 A.2d 894, 897.

### 1. Applicable Law

[¶ 22] Parental rights and responsibilities are determined pursuant to 19-A M.R.S. § 1653 (2008). Specifically, section 1653(3) provides that in awarding parental rights and responsibilities, the court "shall apply the standard of the best interest of the child." 19-A M.R.S. § 1653(3). Similarly, when a party seeks to modify an award of parental rights and responsibilities, the court determines whether such a modification is warranted based on the best interests of the child. *See Smith v.*

---

to the other parent. If the parent who is relocating believes notifying the other parent will cause danger to the parent or the child, the parent shall notify the District Court of the intended relocation, and the District Court shall provide appropriate notice to the other parent in a manner determined to provide safety to the relocating parent and child.

4. Amici curiae are Justice for Children; The Leadership Council for Child Abuse and Interpersonal Violence; Lois Galgay Reckett, Family Crisis Services; Michael Kimmel, Ph. D.; National Association of Women Lawyers; National Coalition Against Domestic Violence; National Organization for Men Against Sexism; Pennsylvania Coalition Against Domestic Violence; and the White Ribbon Campaign.

*Padolko,* 2008 ME 56, ¶ 11, 955 A.2d 740, 744; *see also* 19–A M.R.S. §§ 1653(10)(B), 1657 (2008).

■ [¶ 23] In determining the best interests of a child, a court must consider the current circumstances of the child. *See* 19–A M.R.S. §§ 1653(3)(A)-(R), 1657(2) (requiring that a motion to modify must show a "substantial change in circumstances"). Consequently, a relocation provision that transfers primary residence of a child from a parent if that parent relocates must be based on a current assessment of the child's best interests. *See Rowland v. Kingman,* 629 A.2d 613, 616–17 (Me.1993). *Rowland,* for example, involved a relocation provision that automatically transferred primary residence from the mother to the father if she moved from Maine to Oregon. *Id.* at 615. We concluded that the provision was not an abuse of discretion because the court was presented with ample evidence establishing that the imminent relocation did not serve the children's current best interests. *Id.* at 616–17. Thus, a provision for the automatic transfer of a child's primary residence does not violate statutory requirements if it is responsive to an imminent relocation and is supported by a current assessment of the child's best interests.

[¶ 24] As other jurisdictions have recognized, custody relocation law must also account for individual constitutional rights, including the right to travel and determine one's residence. *See In re Marriage of Ciesluk,* 113 P.3d 135, 142–47 (Colo.2005) (summarizing several states' approaches to balancing constitutional rights in relocation cases). Whether an automatic relocation provision infringes on a relocating parent's constitutional rights is a question of first impression in Maine. *See Rowland,* 629 A.2d at 615 n. 1 (noting that the opinion does not address the alleged violation of a parent's right to travel because the issue was not raised before the trial court). Among other considerations, it requires that a balance be struck between a custodial parent's right to engage in interstate travel and to decide where the parent and child will reside, and a non-custodial parent's right to have continuing and meaningful parent/child contact with the child. *See* American Law Institute, *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 2.17 cmt. a (2002) ("The ability to change one's area of residence is an important individual right. So is having access to one's child.").

2. Justiciability of the Statutory and Constitutional Issues

■ [¶ 25] As an appellate court, we seek to avoid answering important statutory and constitutional questions unless the answer is truly necessary to the resolution of the parties' dispute. *Rangeley Crossroads Coalition v. Land Use Reg. Comm'n,* 2008 ME 115, ¶ 10, 955 A.2d 223, 227; *Swanson v. Roman Catholic Bishop of Portland,* 1997 ME 63, ¶ 15, 692 A.2d 441, 445–46 (Lipez, J., dissenting); *Osier v. Osier,* 410 A.2d 1027, 1029 (Me.1980). Here, the resolution of Handrahan's statutory and constitutional challenges is unnecessary for two reasons.

■ [¶ 26] First, Malenko has conceded that the automatic transfer of custody provision became ineffective as of the issuance of the divorce judgment because Handrahan had not relocated as of that date. With this concession, Malenko is judicially estopped from adopting the opposite position and seeking to enforce the provision in future proceedings. *See Me. Educ. Ass'n v. Me. Cmty. Coll. Sys. Bd. of Trs.,* 2007 ME 70, ¶¶ 16–18, 923 A.2d 914, 917–18. His concession makes it unnecessary for us to construe the provision. It also renders Handrahan's statutory and constitutional arguments moot. *See Lewi-*

*ston Daily Sun v. Sch. Admin. Dist. No. 43*, 1999 ME 143, ¶ 12, 738 A.2d 1239, 1242 (noting that "[c]ourts cannot issue opinions on questions of fact or law simply because the issues are disputed or interesting[, and] only decide cases before them that involve justiciable controversies").

[¶ 27] Second, the divorce judgment contains a separate requirement that Handrahan cannot relocate without giving Malenko thirty days prior notice. If, in the future, Handrahan desires to relocate the child's residence outside of Maine, she must give Malenko prior notice. Upon his receipt of such notice, Malenko may, if he so elects, contest the proposed relocation and obtain a best interest determination based on the child's then-existing circumstances. *See* 19–A M.R.S. § 1653(10), (14).

[¶ 28] In addition to these reasons, the fact that this has been, to date, a high-conflict divorce gives us additional pause. The current round of litigation would be prolonged many months or longer if we remand the case to the trial court for it to clarify the relocation provision, to be followed by a second appeal to us. On the other hand, once the judgment becomes final, Handrahan and Malenko must address future disputes regarding their daughter's primary residence through mediation before resorting to contested litigation. *See* 19–A M.R.S. § 251(2) (2008). If successful, a mediated agreement would save the family from lengthy additional litigation and expense. The prospect of a mediated resolution in this case may prove to be no more than wishful judicial thinking. Nonetheless, a central tenet of Maine family law is that parents who share parental rights and responsibilities must make good faith efforts to communicate and make the difficult joint decisions that co-parenting demands. 19–A M.R.S. § 1653(1)(A) (finding and declaring "as public policy that encouraging mediated

resolutions of disputes between parents is in the best interest of minor children").

[¶ 29] Because Handrahan's statutory and constitutional challenges to the judgment's automatic relocation provision are no longer justiciable, we do not decide them. Based on Malenko's concession, we modify the judgment by striking the automatic relocation provision from the judgment, and, as modified, affirm the court's award of shared parental rights and responsibilities, with primary residential care to Handrahan and rights of parental contact to Malenko.

## B. The Exclusion of Expert Testimony and Reports

 [¶ 30] Handrahan contends that the court abused its discretion in excluding Campbell and Drozd's telephonic testimony. Handrahan also asserts that the court erred by excluding from evidence Devoe's written report for the reason that it was hearsay, but admitting into evidence Kabacoff's written report, which also contained hearsay. We review a "trial court's decision to exclude evidence for an abuse of discretion or clear error." *State v. MacDonald*, 1998 ME 212, ¶ 7, 718 A.2d 195, 198.

### 1. Telephonic Testimony

[¶ 31] The procedural history associated with Campbell and Drozd's testimony is relevant to Handrahan's claim of error. The court issued a pre-trial order on October 3, 2008, notifying the parties that a two-day hearing would be held on December 8 and 9, 2008. The order required the designation of experts and exchange of the experts' reports no later than fourteen days prior to the trial, or November 24, 2008. On November 26, Handrahan filed a notice designating twenty-two witnesses, including Drozd but not including Campbell, none of

whom were identified as expert witnesses. The court record is otherwise unclear as to whether and when Handrahan designated her expert witnesses. The record is clear that on December 1, 2008, Handrahan filed with the court information concerning Drozd's qualifications and opinion. Handrahan's cover letter, which was addressed to the clerk of court, identified Drozd as a potential rebuttal witness, but did not mention Campbell. On December 3, 2008, Handrahan filed a motion seeking to have Drozd and a second witness testify telephonically, stating, with respect to Dr. Drozd, that the witness lives in California and that it would be prohibitively expensive to appear in person. Again, Campbell was not mentioned. Malenko objected to Handrahan's motion to permit telephonic testimony on the grounds that such testimony does not allow the court to evaluate non-verbal communication, and that the ability to assess demeanor and credibility is essential in cases such as this "where the stories being told are diametrically opposed."

[¶ 32] The court considered and denied Handrahan's motion to permit telephonic testimony at the beginning of the hearing, stating that it "really [did not] like taking the testimony of anyone by telephone, for many of the reasons" stated in Malenko's written opposition to the motion.

[¶ 33] Courts exercise considerable discretion regarding the mode of interrogation and presentation of witnesses. *See* M.R. Evid. 611(a).[5] That discretion includes permitting the "presentation of testimony in open court by contemporaneous transmission from a different location" upon a showing of good cause. M.R. Civ. P. 43(a).[6] The record in this case does not establish that the court was compelled to conclude that good cause existed for presenting Drozd's and Campbell's testimony by telephone. Regarding Drozd, Handrahan failed to: (1) comply with the deadlines established for the disclosure of witnesses by the October 3 pre-trial order; (2) provide expert witness information for Drozd until December 1, less than a week before trial; and (3) alert the court and Malenko of the need to present Drozd's testimony by telephone until December 3. This sequence of events deprived Malenko of a reasonable opportunity to take Drozd's deposition prior to trial. Regarding Campbell, the record reflects that Handrahan failed to provide any notice prior to December 8 of her intention to call Campbell as a witness at trial.[7]

---

5. M.R. Evid. 611(a) provides:

 (a) **Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence on direct and cross-examination so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

6. M.R. Civ. P. 43(a) provides:

 (a) **Form.** In every trial, the testimony of witnesses shall be taken in open court, unless a statute, these rules or the Rules of Evidence provide otherwise. The court may, on its own motion or for good cause shown upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location. All evidence shall be admitted which is admissible under the statutes of this state, or under the rules of evidence applied in the courts of this state.

7. Handrahan's trial counsel entered his appearance in the case in mid-November 2008 and filed a motion seeking a continuance of the trial date in order to adequately prepare. The motion asserted that Handrahan's prior attorney needed to withdraw from the case "due to the workload of her office and recent medical problems." The motion to continue was denied. In view of trial counsel's appearance in the case approximately a week

[¶ 34] Because the last minute disclosure of expert witnesses, and their failure to appear at the trial, deprived Malenko of a reasonable opportunity to question Drozd and Campbell in person, the court was not compelled to find good cause pursuant to Rule 43(a), and did not exceed its discretion in refusing to permit either witness to testify telephonically. This conclusion is not affected by whether either witness is labeled a "rebuttal witness," as characterized by Handrahan, as opposed to an "expert witness," or a "rebuttal expert witness." That Handrahan might have used the excluded testimony as rebuttal evidence does not render the court's denial of Handrahan's motion to permit the witnesses to testify by telephone an abuse of discretion. *See Solomon's Rock Trust v. Davis*, 675 A.2d 506, 510 (Me. 1996) (stating that deference is given to a trial court's "determination of what constitutes proper rebuttal").

### 2. Exclusion of Expert Witness' Report

■ [¶ 35] Regarding the court's exclusion of Devoe's written report, the court did not err by ruling it inadmissible as hearsay. The substance of Handrahan's contention is that because Kabacoff's written report was admitted despite containing hearsay, Devoe's written report also should have been admitted. However, at the hearing, Handrahan did not object to the admission of Kabacoff's report and explained that "[it was] attached to [the] guardian report ... so I didn't object to it in that capacity." Pursuant to 19–A M.R.S. § 1507(5) (2008), guardian ad litem reports are "admissible as evidence and subject to cross-examination and rebuttal, whether or not objected to by a party."

The court did not err in excluding Devoe's written report.

### C. Credibility Findings

■ [¶ 36] Handrahan contends that Malenko's testimony concerning his history of violence is contradicted by statements made to third parties and that the record "unambiguously corroborates" Handrahan's testimony. Amici have filed a lengthy brief in support of Handrahan, contending that the court disregarded evidence of abuse, inappropriately relied on gendered stereotypes of "victims" and "batterers" to determine credibility, engaged in unintended gender bias, and inappropriately relied on psychological testing to minimize evidence of abuse.

[¶ 37] As noted previously, neither party filed a motion for additional findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(b) following the court's issuance of the divorce judgment. In the absence of a motion for further findings of fact pursuant to M.R. Civ. P. 52(b), we infer that the trial court made all the findings necessary to support its judgment, if those findings are supported by the record. *Lyons v. Baptist Sch. of Christian Training*, 2002 ME 137, ¶ 13, 804 A.2d 364, 369. In addition, neither party moved for reconsideration of the judgment pursuant to M.R. Civ. P. 59(e).

[¶ 38] Handrahan and amici's assertions that the court's findings and conclusions set forth in the judgment reflect that the court misapprehended the significance of the evidence regarding domestic violence and misjudged each party's credibility were never presented to the court. Consequently, the court was deprived of the opportunity to consider and address

prior to the deadline for the disclosure of expert witnesses and less than a month prior to the trial, there is no indication in the record that trial counsel acted unreasonably by not having exchanged expert witness information in keeping with the timetable established by the pre-trial order.

the same. Although the amici brief offers a comprehensive discussion of recent social science research in support of the claim that the guardian ad litem and Dr. Kabacoff misunderstood and, therefore, wrongly evaluated the evidence of domestic violence in the Handrahan/Malenko relationship, the information provided by amici is not part of the evidentiary record and was not considered by the trial court.

[¶ 39] We take seriously any claim that a judicial proceeding was influenced by gender-based assumptions, stereotypes about domestic violence, or the misuse of psychological testing and pathological labels. These are claims, however, that cannot be decided in a vacuum. None of the social science research presented by the amici is part of the trial record and none of it has been the subject of discovery and cross-examination in this case.

[¶ 40] In contrast, competent evidence in the trial record supports the court's credibility determinations and resulting conclusions regarding Handrahan's claims that Malenko is violent, abusive, and mentally ill. Although Malenko's trial testimony regarding the alleged incidents of domestic violence was not entirely consistent with prior statements he made regarding the incidents to third parties, the court also received evidence that Handrahan had engaged in a sustained, yet unjustified effort to have Malenko labeled psychologically unfit, and that she was "not always a reliable reporter of events" and that her "perceptual distortion is apt to affect the accuracy with which she views ... the actions and intentions of others around her." In addition, the court observed the demeanor and behavior of the parties as witnesses, and properly relied on those observations in assessing credibility. *See Blackmer v. Williams*, 437 A.2d 858, 863 (Me.1981).

[¶ 41] In short, and as is often the case in the family law setting, the trial court was required to make a difficult judgment regarding the relative credibility of the parties. Within the four corners of the trial record before us, we find no basis to second-guess that judgment. Given the conflicting testimony and evidence presented by Malenko and Handrahan, Handrahan's own behavior, and the reasoned basis for the court's decision to accept Malenko's explanation of the relevant events, the court's credibility findings were not clearly erroneous.

The entry is:

Section III(B) of the Divorce Judgment is modified so as to exclusively provide: "Primary physical residence of the daughter is allocated to Defendant." As modified, the Divorce Judgment is affirmed. Mandate to issue immediately.