2012 ME 15

**Paul PELLETIER**

v.

**John PELLETIER et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 10, 2012.
Decided: Feb. 9, 2012.

Peter R. Roy, Esq. (orally), Roy, Beardsley, Williams & Granger, LLC, Ellsworth, for appellants John Pelletier and St. Sauveur Development Corporation.

William B. Devoe, Esq. (orally), and Ryan P. Dumais, Esq., Eaton Peabody, Bangor, for appellee Paul Pelletier.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] John Pelletier and St. Sauveur Development Corporation appeal from a judgment of the Business and Consumer Docket (*Nivison, J.*) entered after a bench trial that determined and divided John Pelletier's and Paul Pelletier's respective interests in St. Sauveur Development Corporation pursuant to 13–C M.R.S. § 1434 (2011). We affirm the judgment, except that we vacate the judgment's requirement that John pay interest beginning in 2002 and remand for a recalculation of interest from 2005 forward.

## I. BACKGROUND

[¶ 2] Paul and John Pelletier are brothers who began acquiring property together in the Bar Harbor area in the 1960s. In 1969, they completed construction of a motel on their first piece of property. After forming St. Sauveur Development Corporation (St. Sauveur) in the 1970s, the brothers transferred title of the motel and other jointly-owned properties to the corporation.[1] Over the many years of their business relationship, the brothers (or St. Sauveur) acquired a number of properties in Bar Harbor.[2]

[¶ 3] Around 1999, Paul voluntarily withdrew from active participation in the business, and John continued to manage the properties and the financial aspects of the business. The brothers began to discuss the division of the business properties, and in 2002, with the consent of both brothers, St. Sauveur retained an appraiser who appraised the corporation's property holdings, with the exception of two undeveloped parcels in Dixmont and Topsfield. The total value of the assessed properties was determined to be $4,208,000.

[¶ 4] After the appraisal, the brothers agreed that Paul would receive three specific properties[3] and John would receive the remaining properties, with the under-

---

1. John handled the incorporation; throughout their business relationship, the brothers never consulted with accountants or attorneys until the events leading to the present litigation.

2. In addition to the motel, the Bar Harbor properties include: 32 Cottage Street, 198 Main Street, 2 Derby Street, 147 Eden Street, 54 Glen Mary Street, 77 Cottage Street, 79 Cottage Street, and 8 Summer Street. They also acquired a vacant lot in Dixmont, Maine, and a vacant parcel in Topsfield, Maine.

3. Paul chose to receive 2 Derby Street, 198 Main Street, and 32 Cottage Street.

standing that John would make a cash payment to Paul to equalize the division. Paul then retained an accountant to assist in determining how much John was to pay Paul. Because John and Paul were both concerned about the capital gains tax consequences of the property transfers, they agreed that the transfer would be structured to minimize the capital gains tax consequences to St. Sauveur and its individual shareholders.

[¶ 5] In 2004, the parties began to act in accordance with their agreement and in October of that year John began making payments to Paul as part of his obligation to equalize the division of corporate assets. In January 2005, Paul hired an accountant to prepare an analysis setting forth several scenarios for the division of the properties, a copy of which was provided to John. Under one of these proposals, the corporation was to pay Paul the sum of $539,810 to equalize the division of property. Further conversations between the brothers followed in which they discussed, among other things, that the purchase price would be paid over a five-year period with interest accruing at the rate of six percent per annum.

[¶ 6] From October 2004 to October 2008, Paul received payments totaling $522,000 as part of the plan to equalize the division of the property. In July 2007, St. Sauveur conveyed the three properties Paul was to receive to Eider Cove, Inc. (Eider Cove), a corporation Paul established for the purpose of owning and maintaining those properties. Prior to this conveyance, Paul had been paid $49,391 in 2005 and $54,125 in 2006, separate from

the equalization payments, as the rents attributable to the three properties.

[¶ 7] In December 2008, Paul filed a complaint initiating this action, pursuant to the Maine Business Corporation Act, 13–C M.R.S. §§ 101–1702 (2011), "for dissolution and other relief." The complaint requested that the court exercise its discretion and grant relief under 13–C M.R.S. § 1434. The case was transferred to the Business and Consumer Docket.

[¶ 8] Following a two-day trial, the court entered a decision and judgment in April 2010 that found that the parties had "agreed to an equitable division of their business properties based on the 2002 values of the properties with the understanding that John would pay to Paul the amount necessary to achieve an equitable division of the assets." Using the 2002 values of the properties and taking into account the amount John had already paid Paul, the court ordered that (1) three properties be set aside to Paul and/or Eider Cove;[4] (2) six properties be set aside to John and/or St. Sauveur;[5] (3) John pay Paul $789,000; (4) the value of the two undeveloped parcels in Dixmont and Topsfield be divided equally between the parties, with John to receive Topsfield and Paul to receive Dixmont and one-half the difference ($26,000) from John, but subject to John's right to elect to retain the properties and pay Paul one-half of their value ($123,000);[6] and (5) the parties structure the transfer to minimize and share equally in immediate capital gains tax consequences.

---

4. The properties designated for Paul were: 198 Main Street, 2 Derby Street, and 32 Cottage Street.

5. The properties designated for John were: the Anchorage Motel, 54 Glen Mary Street, 8 Summer Street, 77 Cottage Street, 79 Cottage Street, and 29 Lookout Point Road.

6. Because the court concluded that the original agreement did not address the Dixmont and Topsfield properties, the court set the values based on the 2008 appraisal.

[¶ 9] In December 2010, the court entered an order amending its judgment in response to Paul's motion for reconsideration. The court reaffirmed its central findings and conclusions, explaining:

(1) that in 2002, the parties agreed that Plaintiff [Paul Pelletier] would receive three of the properties, and that Defendant John Pelletier would receive the remaining properties; (2) that the parties commissioned an appraisal of the properties in order to determine the amount that Defendant John Pelletier would pay to Plaintiff to reconcile the difference in the value of the real property allocated to each party; (3) that upon receipt of the appraisal, the parties confirmed that Plaintiff would receive three of the properties; (4) that the amount that Defendant John Pelletier would pay to Plaintiff, although not specified by the parties, was to be determined based on a simple mathematical computation after the value of the properties was established by the appraisal; (5) that Defendant John Pelletier's delay in making the first payment was not due to the lack of an agreement, but was the result of his awaiting a determination as to the structure of the transfer of property; and (6) that Defendant John Pelletier's payments, Plaintiff's acceptance and negotiation of the payments, the subsequent transfer of the three properties to a corporation formed by and controlled by Plaintiff, and the disbursement of the revenues (e.g., rent) generated by the real property are consistent with the existence of an agreement.

[¶ 10] The court also concluded that, because the parties had reached an enforceable agreement soon after their receipt of the 2002 appraisal, it was appropriate for interest to accrue at the rate of six percent per annum from the date of the appraisal. The court ordered John to pay Paul interest on the amount owed at a rate of six percent, and attached an amortization schedule to its order that detailed its interest determination. John and St. Sauveur (hereinafter referred to collectively as John) appeal from the amended judgment.

## II. LEGAL ANALYSIS

[¶ 11] John's arguments on appeal focus on two issues: (A) whether the court erred in concluding that the parties had entered into an enforceable agreement in 2002, and (B) whether the court erred in failing to find that a check from St. Sauveur marked "final payment" that Paul negotiated in 2009 gave rise to an accord and satisfaction.

### A. Enforceable Contract

[¶ 12] John contends that the court committed clear error in concluding that an enforceable agreement was reached in 2002. He argues that an agreement could not have arisen sooner than 2005 because it was only after the brothers received the analysis from Paul's accountant that they agreed on the actual amount that Paul would receive to equalize the division of property and to the payment terms, including interest at the rate of six percent per annum.

[¶ 13] To be binding, an agreement must be "sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 17, 983 A.2d 382 (quotation marks omitted). When "the existence of an oral contract is disputed or testimony as to its terms and nature is conflicting, it is for the trier of fact to ascertain and determine the nature and extent of the obligations and rights of the parties." *Carter v. Beck*, 366 A.2d 520, 522 (Me. 1976). Determinations of witness credibility are uniquely within the fact-finder's au-

thority, and the fact-finder is "free to discount or entirely ignore testimony" the fact-finder finds incredible. *VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me.1996). On appeal, we review the trial court's findings of fact for clear error and will affirm the findings if they are supported by competent evidence in the record. *State v. Price–Rite Fuel, Inc.*, 2011 ME 76, ¶ 18, 24 A.3d 81. We "examine the record, and the reasonable inferences that may be drawn from the record, in the light most favorable to the trial court's judgment." *Garrison City Broad., Inc. v. York Obstetrics & Gynecology, P.A.*, 2009 ME 124, ¶ 12, 985 A.2d 465.

■ [¶ 14] There is competent evidence in the record to support the trial court's finding that the parties' agreement to the material terms of the contract in 2002 was sufficient to constitute a binding agreement. Evidence presented by both parties indicated that around the time the brothers received the 2002 appraisal, they had agreed which properties Paul would receive and that John would pay Paul an additional amount necessary to equalize the division of property between the brothers, based on the appraisal.[7]

■ [¶ 15] The only material term upon which the brothers had not agreed in 2002 was the precise amount Paul would receive to equalize the division of property. Indeed, that question dominated the subsequent discussions and consultations with accountants and attorneys. However, lack of a key term is not necessarily fatal to the enforcement of a contract, as long as the missing term does not indicate a lack of contractual intent. *Fitzgerald*, 2009 ME 115, ¶ 18, 983 A.2d 382. Here, the court concluded from the evidence that the brothers intended to enter into a binding agreement in 2002. In addition, the broth-

---

**7.** Paul testified:

> Attorney: Do you recall a discussion you had with your brother where you—you and he agreed to get an appraisal—Mr. Haskell to appraise the properties back in 2002?
> Paul: Yes.
> Attorney: Okay. And after you got those appraisers—appraisals, can you tell me, if you remember, what generalized discussions you had about dividing up the properties you had with your brother?
> Paul: Well, the values of the properties were appraised, were added up. And once they were added up, it was apparent that—he chose some, ... I chose some of the properties, and there was a substantial difference between the two. So, it was agreed that I would take ... cash to make the split-up even.

John testified:

> Attorney: Between the time of the appraisal in 2002, and the early part of 2005, which is what I'll ... date ... the Hawkes letter, did discussions between you and your brother continue regarding a break-up of the business?
> John: Yes, they did.
> Attorney: What was the nature of those discussions?
> John: Many times. Well, it was talking about basis for the properties, and capital gains on sales, and then, specifically, the properties that would go to each. It was immaterial to me about the division of the properties, but, he had his mind set, with no objections by me, that he wanted the three properties that were in the agreement.
> . . . .
> Attorney: So, between 2002 and 2005, had there been some agreement reached with respect to what properties Paul wanted? Those three?
> John: Yes. Yes. Yes.
> . . . .
> Attorney: Well, you paid your brother a certain amount of money, and you were going to give him certain of the properties that St. Sauveur owned, isn't that correct?
> John: That's correct.
> Attorney: Other than those two parts of the agreement, were there any other terms that were supposed to happen? Was he supposed to give you back shares of St. Sauveur Development Corporation?
> John: No. No.

ers agreed upon the method by which the missing term—the equalization payment—would be determined. Their actions in the years that followed were consistent with and in furtherance of their agreement.

[¶ 16] A court may supply a key term missing from a contract using the standard of reasonableness. *Id.* Because the parties had agreed on the appraised value of the corporation's properties, which properties would go to each brother, and that the division would result in the brothers each receiving property or cash of equal total value, it was reasonable for the court to determine and supply the missing price term.

[¶ 17] However, we find no support in the record for the court's conclusion that interest should accrue from the date of the 2002 appraisal. *See Price–Rite Fuel, Inc.,* 2011 ME 76, ¶ 18, 24 A.3d 81 ("Findings of fact are clearly erroneous only when no competent evidence supporting the finding[s] exists in the record." (quotation marks omitted)). No evidence was presented that the parties agreed to, or even discussed, the accrual of interest before receiving the first accountant's analysis in 2005. After receiving the analysis, the parties agreed that Paul would collect interest at a rate of six percent per annum on the outstanding principal amount owed to him. This agreement regarding interest was reached in 2005, not 2002, and thus supplemented the existing agreement. Therefore, the determination that interest should accrue from the date of the 2002 appraisal is clear error.

B. Accord and Satisfaction

[¶ 18] John also contends that the court erred by failing to conclude that Paul's cashing of a November 20, 2009, check issued by John that was marked "final payment" gave rise to a final and binding accord and satisfaction of the parties' obligations. A party raising the issue of accord and satisfaction has the burden of proving that it was the intent of *both* parties that the amount was tendered and received in satisfaction of the debt. *Bryson v. Kenney,* 430 A.2d 1102, 1104 (Me.1981).

[¶ 19] Although John offered the check into evidence and testified as to his intent in issuing it, there was no testimony from any witness regarding Paul's intent in receiving and negotiating the check. As Paul argues, the absence of any direct evidence regarding his understanding of the significance of the term "final payment" written on the check is itself potentially significant. When coupled with the evidence of John's established pattern of writing checks to Paul during the extended, multi-year period in which they implemented the division of the corporation's assets, a fact-finder could reasonably infer that Paul understood the term "final payment" to mean the final payment for 2009, the year in which the check was issued. "In determining what should reasonably have been understood [by the parties] . . . consideration must be given to the previous circumstances and conduct of the parties." *Id.* (quotation marks omitted). As the fact-finder, the court was not obliged to adopt as fact John's testimony regarding the significance of the payment. *See id.*

[¶ 20] In the absence of a motion for additional findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(b), we will infer that the trial court made any factual inferences needed to support its ultimate conclusion. *Malenko v. Handrahan,* 2009 ME 96, ¶ 37, 979 A.2d 1269. Here, the court could reasonably have inferred that the parties did not intend the check to be a final payment that concluded all obligations owed between them. Accordingly, the court was not compelled to conclude that John satisfied his burden of

proving that the check gave rise to an accord and satisfaction.

The entry is:

Judgment vacated in part. Remanded to the Business and Consumer Docket to recalculate interest from 2005 forward and to modify the judgment accordingly. In all other respects, the judgment is affirmed.