MAINE SUPREME JUDICIAL COURT                      Reporter of Decisions
Decision:    2013 ME 84
Docket:      Han-12-470
Argued:      September 12, 2013
Decided:     October 10, 2013

Panel:       SAUFLEY, C.J., and ALEXANDER, <u>LEVY</u>, SILVER, MEAD, GORMAN, and
             JABAR, JJ.

## HEATHER C. WICKS

### v.

## PADRAIC H. CONROY

LEVY, J.

[¶1] Padraic H. Conroy appeals from a judgment of the Superior Court (Hancock County, *Cuddy, J.*) partitioning real property he owned as a tenant in common with Heather C. Wicks. Finding no error, we affirm the judgment.

## I. BACKGROUND

[¶2] Conroy and Wicks are brother and sister. In the early 1970s, their mother began living in a two-story oceanfront cottage she owned in Surry, Maine. The cottage sits on a wooded lot on the bay, with views of the mountains on Mount Desert Island. In 1991, the mother (who lived on the first floor) rented the upstairs apartment to Conroy and Wicks's father, from whom she was separated. In 1992, the mother conveyed the property to Wicks and Conroy as joint tenants, retaining a life estate for herself.

2

[¶3]  Shortly after moving into the upstairs apartment, the father fell and suffered a head injury.  At the time, both Conroy and Wicks were living away from Maine.  Conroy informed Wicks that he intended to leave his job in Nevada and move into their father's apartment to care for him, which he did.  The father died soon thereafter and Conroy moved out of the apartment, but he remained in the area, became employed, and married.  Over the next several years, Conroy assisted the mother with the maintenance of the property and performed tasks such as mowing the lawn and clearing snow.  Wicks also assisted with maintenance during her visits from Ohio.  In 2005, with their mother's health deteriorating, Wicks proposed moving to Maine to care for her in exchange for $2000 per month, paid by a home equity loan against the house.  Conroy rejected the proposal.

[¶4]  That same year, Wicks and Conroy executed a release deed to become tenants in common with regard to the property.  Their mother died about a year later.  After her death, Wicks and Conroy had a discussion about the property, and Wicks drafted a summary of what they had discussed, which she asked Conroy to initial.  Conroy refused because the document provided that he could not move into the house until he and Wicks reached further agreement.  Conroy testified to his belief that they had agreed years earlier that he could live in the house rent-free in exchange for moving to Maine to care for their parents.

[¶5]  In July 2006, Wicks wrote Conroy a letter addressing her perceived need "to clarify and come to a workable agreement about how we're going to deal with the house."  The letter contained a list of seven items Wicks wanted to "have a say in."  In item two, Wicks asserted that her contribution to the house's taxes and insurance should take into account Conroy and his wife's rent-free occupancy of the house:

> When the upstairs apartment is rented I need to receive one half of the rental receipts from which I will pay for a prorated portion of the taxes and insurance.  (That portion can be worked out later, in consideration for your having the advantage of living in the house rent-free as well as for all your hard work, skill and your responsibility for maintaining it.)

Item five expressed Wicks's desire to use the house: "Until we agree on a future course, I will need access to one apartment for my private use for one month of the year, during the summer season."  Wicks also stated that her "ultimate relationship to the house . . . is still completely undecided," and that the present dealing between Wicks and Conroy would "determine how well we negotiate whatever agreement we come to in the future."

[¶6]  In 2008, Conroy and his wife told Wicks that they were moving into the downstairs apartment.  Wicks responded that she "needed financial compensation for [Conroy's] exclusive use of [her] half of the [downstairs

4

apartment]." Conroy and his wife nonetheless moved into the apartment in October 2008.

[¶7] By August 2009 the upstairs apartment, which Wicks and Conroy rented out, had fallen into disrepair because of water damage. Wicks and Conroy agreed that they would make the necessary repairs to have the apartment ready to rent by the summer of 2010. Conroy asked Wicks to fix the floor, which she did. The upstairs apartment went unrented for about a year, however, while Conroy undertook other renovations to the property.

[¶8] In May 2010, Wicks filed a complaint in the Superior Court seeking an equitable partition and sale of the house, with the profits to be split equally between her and Conroy. Conroy agreed that partition was appropriate, but contended that he was entitled to a larger share of the proceeds from the partition sale, and he expressed his desire to purchase Wicks's interest in the house. Conroy also asserted counterclaims of breach of contract, unjust enrichment, and promissory and equitable estoppel.

[¶9] Following a jury-waived trial, the court entered a judgment in June 2012. The court granted Wicks's petition for partition, denied Conroy's counterclaims, and ordered the sale of the house. The court ordered the profits from the sale to be split equally between the parties, subject to a $9350 credit due to Wicks. The court arrived at this figure by finding that Wicks was entitled to

$13,650 as credit for Conroy's rent-free occupancy of the downstairs apartment from 2009 to 2012, and $3750 for the share of rental income Wicks would have received had the upstairs apartment been rented during the year Conroy took to renovate it, less $8050 credited to Conroy for his improvements to the house.[1] The court also denied Conroy's request that he be allowed to purchase Wicks's interest because Conroy failed to present evidence of his financial ability to do so.

## II. DISCUSSION

[¶10] Conroy contends that the court erred in (A) finding that there was no contract in which the parties agreed that Conroy would live in the house rent-free in exchange for his care of their parents; (B) crediting Wicks for one-half the fair rental value of the downstairs apartment during the period that Conroy and his wife lived there; and (C) denying Conroy the opportunity to buy out Wicks's interest in the property.[2] We consider each argument in turn.

A.    The Existence of a Contract

[¶11] We review the court's finding that no contract existed for clear error, and will affirm the finding if competent evidence in the record supports it. *See*

---

[1] After the judgment, Conroy filed a motion for findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(a), which the court denied. Conroy then filed a motion to alter or amend the judgment pursuant to M.R. Civ. P. 59(a), which the court granted. The amended judgment credited Conroy an additional $300 for his improvements to the property. Thus, the total credit to Wicks was amended to $9050. The amendment is not at issue in this appeal.

[2] Conroy also challenges (1) the court's determination of the credit due to him for his maintenance, improvement, and management of the property, and (2) the court's determination of the fair market value of the property. We are not persuaded by Conroy's arguments and do not address them further.

*Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903. A contract requires that the parties mutually assent to be bound by its terms. *Barr v. Dyke*, 2012 ME 108, ¶ 13, 49 A.3d 1280. Here, the court concluded that Wicks never assented to a contract under which Conroy would live in the house without paying rent. The record supports this finding. Wicks testified that she did not agree to Conroy's proposal that he would live rent-free in the house in exchange for his care for their parents. Although Conroy offered contradictory testimony, the court, as the fact-finder, was entitled to accept Wicks's testimony as more credible. *See Dostanko v. Dostanko*, 2013 ME 47, ¶ 15, 65 A.3d 1271 (noting the fact-finder's superior position to assess the credibility of the parties).

[¶12] Despite Conroy's assertion to the contrary, Wicks's 2006 letter to Conroy does not lead us to conclude that the trial court's finding was clearly erroneous. Item two of the letter states that Wicks "will pay for a prorated portion of the taxes and insurance . . . in consideration for [Conroy] having the advantage of living in the house rent-free." Although Wicks's letter mentions Conroy living in the house rent-free, the court found the context of the letter to be prospective, rather than a memorialization of a past agreement. This interpretation is consistent with a plain reading of the letter, which suggests that Wicks believed that she was due consideration for allowing Conroy to live in the house, not that Conroy had already performed his side of an agreement between them. Further, the letter states

that there had been no agreement as to the "future course" of the house and that Wicks and Conroy were to "negotiate whatever agreement we come to in the future." It also expressed Wicks's belief that her "ultimate relationship to the house . . . is still completely undecided."[3]

[¶13] Accordingly, competent evidence supported the court's finding that Wicks and Conroy did not agree that Conroy would live rent-free in the downstairs apartment. *See Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903. As such, the court properly found that there was no contract to that effect. *See Barr*, 2012 ME 108, ¶ 13, 49 A.3d 1280.

B.     Credit for the Fair Rental Value of Property Occupied by a Co-Tenant

[¶14] Conroy contends that the court erred in crediting Wicks with one-half the fair rental value of the first-floor apartment for the time Conroy and his wife lived there because Wicks presented no evidence (1) of the fair rental value of the apartment or (2) that Conroy ousted Wicks from the premises.

---

[3] For these reasons, the court also properly rejected Conroy's counterclaims of unjust enrichment and promissory and equitable estoppel. With respect to unjust enrichment, Conroy failed to prove that Wicks accepted or retained any benefit from him under such circumstances that it would be inequitable for Wicks to retain the benefit without paying its value. *See A.F.A.B., Inc. v. Town of Old Orchard Beach*, 610 A.2d 747, 749 (Me. 1992). The court also properly found that Conroy had failed to prove either promissory or equitable estoppel. *See Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978) (stating that promissory estoppel requires a promise reasonably expected to induce action); *Milliken v. Buswell*, 313 A.2d 111, 119 (Me. 1973) (cautioning that equitable estoppel should be "sparingly applied" in only those cases where there is "clear and satisfactory proof" of fraud or fault on the part of the person to be estopped).

### 1. Evidence of Fair Rental Value

[¶15]  The determination of an asset's value is an issue of fact, which we review for clear error and will affirm if supported by the record.  *See Laqualia v. Laqualia*, 2011 ME 114, ¶ 10, 30 A.3d 838.  Here, Wicks testified that the fair rental value of the downstairs apartment was $650 per month.  "Property owners, by reason of their ownership alone, may state their opinion as to the fair market value of their property."  *Hutz v. Alden*, 2011 ME 27, ¶ 15, 12 A.3d 1174 (quotation marks omitted).  The court's determination of the fair rental value based on Wicks's testimony was therefore proper.  *See Laqualia*, 2011 ME 114, ¶ 10, 30 A.3d 838.

### 2. Proof of Ouster

[¶16]  Conroy also contends that the court erred as a matter of law in crediting Wicks with half of the fair rental value of the first floor apartment for the time that Conroy occupied it because there was no evidence that Conroy had ousted Wicks from the property.  An ouster occurs when a tenant in common "denie[s] [the co-tenant's] right to the possession, or [does] some notorious act, indicative of a holding adversely to [him]."  *Colburn v. Mason*, 25 Me. 434, 435 (1845).  Conroy cites to our decision in *Palanza v. Lufkin*, 2002 ME 143, 804 A.2d 1141, in support of his position.

[¶17] *Palanza* was a partition action in which the trial court refused to credit a co-tenant for the rental value of the property during the period in which the other co-tenant possessed and made repairs to the property. *Id.* at ¶ 13. We affirmed, noting that the court properly found that the co-tenant in possession (Palanza) derived no net economic benefit from occupying or renting the property during the renovations. *Id.* ¶ 15. We also observed that "without evidence of the rental value of the property before the improvements, and without evidence that Palanza ousted Lufkin, the court could not find that Palanza owed Lufkin any quantifiable amount." *Id.* Our opinion cited to a Missouri Court of Appeals decision, *Christen v. Christen*, 38 S.W.3d 488, 492 (Mo. Ct. App. 2001), in support of this proposition.

[¶18] *Christen* does stand for the well-established proposition that an out-of-possession tenant must prove the reasonable rental value of the property to successfully claim compensation for a co-tenant's occupancy. *Id.* But it does not require the out-of-possession tenant to prove that the other tenant ousted her. Indeed, *Christen* states the opposite: "Ouster by the tenant in exclusive possession is not required."[4] *Id.* In keeping with this, we see no sound reason to require proof

---

[4] The Missouri Court of Appeals explained in an earlier decision:

> In this state it is settled that a cotenant, who has enjoyed the occupancy of the premises, who seeks and is to be granted an allowance for improvements made thereon[,] subjects himself to the crediting of his out-of-possession cotenant with the reasonable value of the premises he occupied, and, in partition *equity may set off that rental value* against the

of ouster if the circumstances otherwise support a court's conclusion that the rental value of a co-tenant's possession must be taken into account to achieve an equitable partition of the parties' co-tenancy.

[¶19] Accordingly, we clarify that in a proceeding for equitable partition the court may consider the reasonable rental value of the property during the period when one co-tenant was in exclusive possession of the property, without requiring proof of ouster. The court therefore did not err in setting off the reasonable rental value of the property against the value of Conroy's improvements without specifically finding that Conroy ousted Wicks from the property.

C.     Conroy's Right to "Buy Out" Wicks's Interest in the Property

[¶20] We review for an abuse of discretion a court's decision to allow one co-tenant to purchase the interest of another co-tenant. *See Ackerman v. Hojnowski*, 2002 ME 147, ¶¶ 18-19, 804 A.2d 412. "In exercising its discretion, the court must consider all relevant factors," which include, but are not limited to, the purchasing co-tenant's duration of residence, his improvements to the property, and his financial capacity to pay for the other co-tenant's interest in the property. *Id.* ¶ 20.

---

improvements, taxes *and other charges* paid by the tenant in exclusive possession although he has not ousted his cotenant.

*Grunden v. Nelson*, 793 S.W.2d 569, 576 (Mo. Ct. App. 1990) (quoting *Allen v. Allen*, 687 S.W.2d 660, 662 (Mo. Ct. App. 1985)).

[¶21] Here, the court denied Conroy the unconditional opportunity to purchase Wicks's interest in the property because Conroy presented no evidence that he could afford to do so. The court cited no other factors it considered. Because the court denied Conroy's motion for further findings on the issue, we will not infer that the court considered any other factors. *See Thumith v. Thumith*, 2013 ME 67, ¶ 11, 70 A.3d 1232. Thus, the question is whether the absence of proof that a co-tenant has the financial ability to buy out another co-tenant's interest, standing alone, justifies a court's denial of that opportunity. The facts of this case lead to an affirmative answer.

[¶22] Here, granting Conroy the right to purchase his sister's interest could prolong the final resolution of what has already been a lengthy and contentious dispute. Absent a showing that Conroy has the means to acquire Wicks's interest, it would not square with principles of equity for the court to afford him that opportunity. *See Libby v. Lorrain*, 430 A.2d 37, 40 (Me. 1981) ("Without Mrs. Lorrain's being able to carry out her side of a 'partition by buy-out,' the court could not equitably honor her request."). The court acted well within the bounds of its equitable authority in denying Conroy the right to buy out Wicks's interest in the property.

The entry is:

Judgment affirmed.

_____

**On the briefs and at oral argument:**

Catherine L. Haynes, Esq., Ellsworth, for appellant Padraic Conroy

Eugene C. Coughlin, Esq., Vafiades, Brountas & Kominsky, LLP, Bangor, for appellee Heather Wicks

Hancock County Superior Court docket number RE-2010-29