STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, SS.                         LOCATION: PORTLAND
                                        Docket No. BCD-CV-15-18 ⁄

GENERAL MARINE CONSTRUCTION        )
CORP.,                             )
                                   )
                                   )        **ORDER ON MOTION**
            Plaintiff,             )      **FOR SUMMARY JUDGMENT**
                                   )
    v.                             )
                                   )
ACADIA INSURANCE GROUP, LLC and    )
DEMOND AND PAYNE, d/b/a CROSS      )
INSURANCE - PORTLAND,              )
                                   )
            Defendants.            )

Defendants Acadia Insurance Group, LLC ("Acadia") and Desmond and Payne,

d/b/a Cross Insurance-Portland ("Cross") move for summary judgment on claims brought

by Plaintiff General Marine Construction Corporation ("General Marine") for fraud,

negligent misrepresentation, misrepresentation under 24-A M.R.S.A. § 2153, and

promissory estoppel. The Defendants contend summary judgment is warranted because:

1) there was no misrepresentation; 2) even if there was, General Marine could not

justifiably rely on the alleged misrepresentation; and 3) in any event, General Marine did

not suffer any detriment from its alleged reliance. For the reasons discussed below, the

court **denies** summary judgment against Counts I, II, and IV of the Complaint, and

**grants** summary judgment against Count III for misrepresentation under 24-A M.R.S.A.

§ 2153.

1

## I. Factual Background

General Marine owns Holyoke Wharf, which is located on Portland Harbor. (Def.s' S.M.F. ¶ 1.) On November 8, 2011, General Marine entered into a lease agreement with Down the Bay Lobster ("Down the Bay") for the lease of a building located on Holyoke Wharf. (*Id.* ¶ 2.) The Lease provided for its initial term, from December 1, 2011 through November 30, 2012, to be extended at Down the Bay's option for a second term of four years. (*Id.* ¶ 3.) The Lease also provided, in pertinent part, that General Marine "shall provide services to the leased premises as follows:

> B. Procurement of hazard insurance with extended coverage on the buildings and improvements exclusive of land, excavation, foundations and all other items normally excluded and also exclusive of improvements or betterments installed by tenants....

(Ex. A to Poliquin Aff. (the "Lease"), p. 16 § 15.B.) General Marine procured insurance from Excelsior Insurance Company, with Policy No. CBP 5448304 in effect from 12/31/2012 through 12/31/2013 (the "Excelsior Policy"), to fulfill this obligation. (*See* Def.s' S.M.F. ¶ 5; Pl.'s Opp. S.M.F. ¶ 5.) The Excelsior Policy provides, in pertinent part:

> We will pay for direct physical loss of or damage to covered property at the premises described in the Declarations caused by or resulting from any covered Cause of Loss....Covered Property, as used in this Coverage Part, means the type of property described in this section....Building, meaning the building or structure described in the Declarations....

(Def.s' S.M.F. ¶ 14.)

The Lease also obligated Down the Bay to maintain general liability insurance as follows:

> A. Tenant shall maintain and carry throughout the term of this Lease and any extensions thereof commercial general liability insurance coverage in standard form with Broad Form coverage endorsement on said

2

premises, in such amount and against such risks as Owner shall approve, the terms of which coverage shall name Owner as an additional insured and provide that such insurance shall not be changed or cancelled without at least a ten (10) day prior written notice to Owner. Appropriate certificates thereof are to be delivered to Owner. The policy shall indemnify the Owner and/or Tenant, as their interests may appear, against all claims and demands for all personal injuries to or death of any persons, and damages to or destruction or loss of property in or about the demised premises with minimum coverages of:

1. One Million Dollars ($1,000,000.) per person with respect to injury or death to one person;
2. Two Million Dollars ($2,000,000.) per occurrence with respect to injury or death to more than one person; and
3. Five Hundred Thousand Dollars ($500,000.) with respect to damage to property.

(The Lease, pp. 5-6 § 8.)

Down the Bay obtained insurance coverage from Acadia, with Policy No. 5022883-10 in effect from 11/14/2012 through 11/14/2013 (the "Acadia Policy").

(Def.s' S.M.F. ¶ 7.) The Acadia Policy excludes from coverage:

"Property Damage" to: Property you own, rent, or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property....The exclusion does not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days.

(*Id.* ¶ 9.)

On November 15, 2012, Cross provided a certificate of liability insurance to General Marine identifying the Acadia Policy. (*Id.* ¶ 10.) The Certificate contained the following disclaimer language:

This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below. This certificate of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder

3

...
> This is to certify that the policies of insurance listed below have been issued to the insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate ay be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies, limits shown may have been reduced by paid claims.

(*Id.* ¶ 11.) The Certificate also represented that it provided coverage for "DAMAGE TO RENTED PREMISES (Ea occurrence)" up to a $250,000 limit. (Ex. A. to Complaint, the Certificate.)

During each year of the initial and extension term of the Lease between General Marine and Down the Bay, General Marine received, on an annual basis, a declaration of Certificate of Liability Insurance from Cross, listing General Marine as the certificate holder and as an additional insured. (Pl.'s A.S.M.F. ¶ 1.) The certificates were in all material respects identical to the copy of the certificate dated November 15, 2012. (*Id.*)

General Marine asserts that it and, its president Roger Hale, understood based on the Certificate that the Defendants were certifying Down the Bay had procured liability insurance covering "damage to rented premises (each occurrence)" with coverage limits of $250,000 from them. (*Id.* ¶ 2; Hale Aff. ¶ 6.) General Marine asserts that it, and Mr. Hale, specifically understood that the rented premises for which the coverage was provided were the premises General Marine rented to Down the Bay. (Pl.'s A.S.M.F. ¶ 2.)

In October 2013, during the second term of the Lease, the building Down the Bay leased was vandalized and damaged by a third party. (Def.s' S.M.F. ¶ 12.) The cost of repairing the damage caused by the third party was $4,250.00. (*Id.* ¶ 13.) General Marine asserts that the vandals were not authorized to act under the Lease and that their

4

presence on the premises was the direct and proximate result of Down the Bay's negligence. (Pl.'s' A.S.M.F. ¶ 3; Hale Aff. ¶ 7.)

General Marine advised Down the Bay that it considered Down the Bay responsible for the damage under the terms of the Lease and, as a result, Down the Bay gave notice of the claim to Acadia and Cross on or about February 24, 2012. (Pl.'s' A.S.M.F. ¶ 4.) General Marine brought suit against Lawrence O. Rich, Jr. as principal and guarantor of the obligation of Down the Bay and recovered judgment on May 12, 2014 for its damages including the property damage to the leased property, but has collected nothing on its judgment. (*Id.* ¶ 5.) Through its attorneys, General Marine asked Cross and Acadia to satisfy the judgment. (*Id.* ¶ 6.) They have refused. (*Id.*)

## II.    Discussion

"The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question[s] before the court [are] solely...of law." *Bouchard v. American Orthodontics*, 661 A.2d 1143, 44 (Me. 1995). "Summary judgment is properly granted if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Angell v. Hallee*, 2014 ME 72, ¶ 16, 92 A.3d 1154 (quotation omitted). "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive. *Id.* (quotation omitted). In reviewing a motion for summary judgment, the nonmoving party is given "the full benefit of all favorable inferences that may be drawn from the facts presented." *Id.* (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18). "To survive a defendant's

5

motion for a summary judgment, the plaintiff must establish a prima facie case for each element of [their] cause of action." *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346.

General Marine's fraudulent misrepresentation claim requires it to make out a prima facie case, by clear and convincing evidence that:

> The defendant (1) ma[d]e a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true of false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relie[d] upon the representation as true and acts upon it to his damage.

*St. Francis*, 2002 ME 127, ¶ 26, 818 A.2 995 (quoting *Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979)). Because clear and convincing evidence is required, General Marine bears the burden of persuasion to "place in the ultimate factfinder an abiding conviction that the truth of [its factual contentions] are 'highly probable.'" *Id.* (quotation omitted).

Similarly, General Marine's negligent misrepresentation requires it to establish that the Defendants: (1) in the course of their business, profession or employment, or in any other transaction in which they have a pecuniary interest; (2) supplied false information for the guidance of others in their business transactions; (3) failed to exercise reasonable care or competence in obtaining or communicating the information; and (4) caused pecuniary loss to General Marine based on its justifiable reliance on the information. *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771. 24-A M.R.S. § 2153 likewise prohibits the misrepresentation of insurance policy terms.

In order to prevail on its promissory estoppel claim, General Marine must demonstrate: 1) a promise which the Defendants should reasonably expect to have induced action or forbearance on the part of Down the Bay or General Marine; 2) that the promise did induce such action or forbearance; and 3) that the only way to avoid an

6

injustice is to enforce the promise. *Struck v. Hackett*, 668 A.2d 411, 420 (Me. 1995) (quotation omitted).

A.     Whether the Certificate of Insurance Misrepresents the Terms of the Acadia Policy

Defendants argue that the representations made in the Certificate cannot be the basis for a misrepresentation claim. They argue that even though the Law Court has held that affirmative misrepresentations of coverage in a certificate of insurance may be actionable, that ruling requires, at a minimum, an actual and irreconcilable conflict between the language of the policy and the certificate. *See St. Francis De Sales Credit Union v. Sun Ins. Co. of New York*, 2002 ME 127, 818 A.2d 995. The Law Court, Defendants contend, has never extended this principle to require insurers to disclose in a certificate the nature of all exclusions and other permutations that place limits on the coverage identified in the certificate. Defendants also point to *Ann Taylor, Inc. v. Heritage Servs., Inc.*, which distinguishes *St. Francis*, and other opinions, as involving certificates of insurance that made affirmative representations of coverage or overstatements of coverage that were in conflict with the actual policy. 259 S.W. 3d 494, 498-99, 501 (Ky. Ct. App. 2008).

Defendants contend that this distinction between a fraud claim alleging an affirmative misrepresentation—such as *St. Francis*—and a "mere failure to disclose"—such as *Ann Taylor*— is easily reconciled with the well-established principle that a plaintiff can only recover for a failure to disclose in a limited set of circumstances. Specifically, when the plaintiff can prove either active concealment of the truth or a specific relationship imposing on the defendant an affirmative duty to disclose. *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me. 1995). Defendants argue that an

7

active concealment is not alleged and that no special relationship between an insurer and an insured, let alone a third party, imposes an affirmative duty to disclose. Taken together, Defendants contend there is no misrepresentation because the facts show, at worst, that they failed to explain the relevance of every exclusion contained within the Acadia Policy to General Marine.

General Marine responds that pursuant to *St. Francis*, whether the Certificate includes false or misleading assertions of fact, and whether reliance thereon is reasonable, is a question for the jury. General Marine further contends that no meaningful distinctions exist between the present situation and the one presented in *St. Francis*. This is because contrary to what was "certified," coverage for the type of loss at issue simply did not exist except for perhaps the first seven days of the initial term of the Lease. In effect, the Defendants argue it was "reasonable" for them to certify they were providing insurance for damages to the premises from a host of causes when they knew exclusions in the Policy eliminated all or virtually all of the coverage simply because the Certificate included boilerplate that there might be some exclusions.

Defendants reply that the Certificate in the present case and in *St. Francis* are distinguishable on the most significant factor relevant to the misrepresentation issue. Specifically, the certificate in *St. Francis* made the affirmative false representation that coverage applied to loss or damage "from any cause whatsoever," when the actual policy excluded coverage for losses resulting from certain causes, including the one at issue. In the present case, the certificate merely identifies coverages that are provided under the policy, with no representation regarding the scope of any limitations or exclusions that might be imposed on those coverages in the insurance policy itself. Defendants contend

8

that a certificate which represents the existence of a type of coverage is not a false representation simply because factual scenarios exist that would not be covered, or because the coverage has certain limitations or strictures that make the coverage inapplicable to a particular insured's situation.

In *St Francis*, a group of Credit Unions required an armored car company, Maine Armored Car, to purchase insurance covering liability against the loss of Credit Union property. 2002 ME 127, ¶ 3, 818 A.2d 995. Maine Armored Car purchased a policy from its insurer that provided coverage for any liability the policyholder may incur while transferring checks from safes or ATMs. *See id.* at ¶ 4. The policy provided, however, that it only provided coverage if the loss was caused by a person or persons gaining unlawful access to the safes or ATMs through the use of a master key, dial rim lock key, guard key or combination. *Id.*

Annually, at Maine Armored Car's request, the insurer issued a certificate of insurance to each Credit Union certifying that Maine Armored Car had obtained a policy of insurance "for loss of property of its customers from any cause." *Id.* at ¶ 5. The first paragraph of the certificates of insurance provided:

> This certificate is furnished simply as a matter of convenience to its holder(s) and gives information as to the issuance of the below mentioned policy, and sets forth certain features of the coverage as stated in said policy as it stands as of the date of issue hereof. This Certificate confers no rights on the holder(s). Said Policy, which contains the full provisions of the contract and insurance granted thereby is subject to endorsement, alteration, transfer, assignment and cancellation without notice to the holder(s) of this Certificate.

*Id.* The certificates then described the coverage in the underlying policy as "covering the liability assumed by [the armored car company] for loss or damage, *from any cause whatsoever*, to property of customers...." *Id.* at ¶ 6 (emphasis in original). The

9

certificates then listed a number of exclusions, but did not mention exclusions for theft. *Id.*

After a thief broke into a lock box by force, Maine Armored Car submitted a claim to its insurer. *Id.* at ¶ 7. Because the theft was not gained through the "use of a master key, dial rim lock key, guard key or combination," the insurer denied coverage for the loss. *Id.* The insurer moved for summary judgment against the Credit Unions' allegations of fraud arguing that there was no evidence of a false representation, justifiable reliance, or scienter. *Id.* at ¶ 27. The Law Court found that, when viewed in the light most favorable to the Credit Unions, "a jury could conclude to a high probability that the representations in the certificates stating that Maine Armored Car was fully covered for losses from any cause whatsoever were false." *Id.* at ¶ 28. This was because the certificates asserted that the policy provided coverage for loss or damage, "from any cause whatsoever," but did not mention any exclusions pertaining to theft when, in fact, the policy only provided coverage for thefts committed in a particular manner. *Id.*

Here, while the Certificate does not contain misleading language that it covers damage from "any cause whatsoever" like *St. Francis*, when the evidence is viewed in the light most favorable to General Marine, a jury could conclude to a high probability that the Certificate misrepresents the terms of the Policy. This is because the Certificate represents that it provides coverage, with limits of $250,000 for "DAMAGE TO RENTED PREMISES," but the terms of the Policy exclude coverage for property damage to the premises Down the Bay rented unless the premises were "rented to you for a period of 7 or fewer consecutive days." Given that the Lease between General Marine and Down the Bay was initially for a year—and subsequently extended—a jury could

10

conclude to a high probability that the Policy did not—in effect—provide any coverage for property damage to the rented premises. While the Defendants try to explain away the coverage provided in the Policy as simply limited by exclusions, a jury could conclude to a high probability that the exclusions effectively negated coverage, rendering the affirmative representation of coverage false.

*Ann Taylor*, upon which Defendants rely, does not hold to the contrary. 259 S.W.3d 494. In *Ann Taylor*, a certificate holder brought suit alleging negligent misrepresentation by an insurer based on the certificate's pronouncement of coverage without disclosing an exclusion from coverage for losses stemming from an unattended vehicle. *Id.* at 495-496. *Ann Taylor* determined that it was not reasonable for the certificate holder to rely on the certificate when it clearly set forth that it conferred no rights, should not be relied upon, and was not a complete recitation of the exclusions and applicable provisions of the insurance policy. *Id.* at 498-99. *Ann Taylor* then distinguished *St. Francis*, and similar opinions, as involving certificates that "affirmatively set forth provisions that differed from the language in the respective policies" whereas "[t]he case at hand does not deal with conflicting language or terms." *Id.* at 500. As set forth above, a jury could conclude to a high probability that the Certificate in the present case contained an affirmative representation that it provided coverage for property damage to the rented premises, when in fact no such coverage was available.

B.     Whether the Disclaimers in the Certificate Precluded General Marine From Justifiably Relying on the Representations of Coverage

The Defendants also contend that summary judgment is warranted because the disclaimer in the Certificate precludes General Marine from justifiably relying thereon.

11

In general, Defendants assert that certificates of insurance are informational documents not intended to expand or modify the underlying policy or rights of the policyholders. In particular, Defendants contend that the Certificate at issue contains clear language that it is solely informational, confers no rights on the certificate holder, does not amend or alter the coverage afforded by the Policy, and that the coverage provided under the Policy is subject to all the terms, exclusions and conditions laid out in the Policy. Defendants assert that the unambiguous disclaimer of reliance in the Certificate is enforceable under Maine law, has been recognized in the majority of jurisdictions outside Maine, and precludes justifiable reliance by General Marine. *See Barr v. Dyke*, 2012 ME 108, ¶¶ 27-30, 49 A.3d 1280; *Combined Mgmt. Inc. v. Reliance Nat. Ins.*, 1996 Me. Super. LEXIS 393 (Dec. 9, 1996).

Justifiable reliance is an element of General Marine's misrepresentation claims and promissory estoppel claim. *See Maine Eye Care Associates P.A. v. Gorman*, 2008 ME 36, ¶ 11, 942 A.2d 707 (discussing the element of justifiable reliance in fraudulent misrepresentation cases); *Langevin v. Allstate Ins. Co.*, 2013 ME 55, ¶ 11, 66 A.3d 585 (discussing the same in negligent misrepresentation claims); *Wicks v. Conroy*, 2013 ME 84, ¶ 12 n.3, 77 A.3d 479 ("Promissory estoppel requires a promise reasonably expected to induce action"). A party "may justifiably rely on the fraudulent misrepresentation of [another] without investigating the truth or falsity of the representation." *St. Francis*, 2002 ME 127, ¶ 30, 818 A.2d 995 (quotation omitted). "Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him." *Id.* (quoting *Estate of Whitlock*, 516 A.2d 1173, 1176 (Me. 1992)).

12

In determining whether General Marine could justifiably rely on the representations in the Certificate, the Law Court's analysis in *St. Francis* is instructive. In that case, the certificates of insurance explained that:

> This certificate is furnished simply as a matter of convenience to its holder(s) and gives information as to the issuance of the below mentioned policy, and sets forth certain features of the coverage as stated in said policy as it stands as of the date of issue hereof. This Certificate confers no rights on the holder(s). Said Policy, which contains the full provisions of the contract and insurance granted thereby is subject to endorsement, alteration, transfer, assignment and cancellation without notice to the holder(s) of this Certificate.

*Id* at ¶ 5. The certificates then described the coverage in the underlying policy as "covering the liability assumed by [Maine Armored Car Company] for loss or damage, *from any cause whatsoever*, to property of customers...." *Id.* at ¶ 6 (emphasis in original). The insurer presented evidence that: 1) the credit unions are experienced in insurance-related matters and knew that the certificates of insurance clearly stated that they conferred no rights; 2) the certificates at issue stated that the referenced policy could be cancelled without notice to the holder; and 3) some of the credit unions may not have actually read the entire certificates. *Id.* at ¶ 30. The Credit Unions, however, produced evidence to show that the insurer issued the certificates for the purpose of causing the credit unions to believe that Maine Armored Car was insured for the loss of its customers property "from any cause whatsoever." *Id.* In addition, employees from the credit unions testified that they believed the representations in the certificates were true, that they relied upon the certificates in deciding to do business with the armored car service, and that they entrusted their property to the armored car service only after reviewing the certificates. *Id.* at ¶ 30. In light of this conflicting evidence and the language of the certificates, *St. Francis* found the Superior Court did not err by refusing to grant

13

judgment as a matter of law in favor of the insurer due to a lack of justifiable reliance. *Id.* at ¶¶ 30, 37.

Here, a reasonable jury could find that General Marine justifiably relied on the Certificate's assertion that it provided coverage for property damage in spite of its broad disclaimer that it is informational only and does not amend, extend or alter the coverage afforded by the policies. This is because the Law Court in *St. Francis* found that the trial court did not err when it denied a motion for judgment as a matter of law under similar circumstances. 2002 ME 127, ¶¶ 5, 29-30, 818 A.2d 995. Although *St. Francis* did not offer in-depth analysis regarding justifiable reliance, it essentially found that the disclaimer of reliance clause in the certificate of insurance at issue was avoidable due to the alleged demonstration of fraud. *Id.* Indeed, *Barr v. Dyke*, upon which defendants rely, recognized that in certain circumstances, general disclaimers or releases may be avoided upon a demonstration of fraud. *See* 2012 ME 108, ¶¶ 21, 28-30, 49 A.3d 1280. While *Barr v. Dyke* does not elaborate all of the circumstances upon which a disclaimer may be avoided upon a demonstration of fraud, *St. Francis* indicates that when a certificate of insurance contains material misrepresentations, avoidance is justified.[1]

C.        Whether General Marine Could Have Relied on the Certificate to its Detriment in Light of the Lease's Requirement that General Marine Procure Insurance

Defendants argue that General Marine could not have relied on the Certificate to its detriment because claims by General Marine against Down the Bay and the Acadia Policy are barred by contract. This is because General Marine was contractually bound to procure property insurance to cover this loss and in fact did so. This obligation,

---

[1] While *Combined Mgmt. v. Reliance Nat'l Ins. Co.*, 1996 Me. Super. LEXIS 393 (Dec. 9, 1996) holds to the contrary, that opinion is not binding and was issued before the Law Court's ruling in *St. Francis*.

14

Defendants argue, creates a waiver of subrogation. "A waiver of subrogation is a provision by which parties to a contract relieve each other of liability to the extent each is covered by insurance, thereby shifting the risk of loss to an insurer." *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 13, 868 A.2d 220. Defendants argue that the Lease obligated General Marine to procure hazard insurance with extended coverage on all buildings and improvements on the leased premises. General Marine did, in fact, obtain said insurance and it would have provided coverage for the vandalism loss had General Marine submitted a claim. As a result, General Marine contracted away its right to pursue a claim against Down the Bay for the vandalism damage.

General Marine responds that Defendants' argument is meritless as it contends, in effect, that the Lease should be interpreted as a contractual agreement by General Marine to look exclusively to its own insurance for any loss caused by Down the Bay. That interpretation, however, is not plausible because the Lease required Down the Bay to procure insurance naming General Marine as an additional insured. The most logical interpretation of the Lease, General Marine argues, is that the landlord bargained to be able to assert a claim against Down the Bay's carrier precisely so that, if Down the Bay were at fault, General Marine would not have to pay a deductible or risk increase in its premiums.

Defendants reply that there is no tension or inconsistency between a waiver of claims covered by property insurance and Down the Bay's contractual obligation to procure liability insurance naming General Marine as an additional insured. They argue that courts uniformly hold waivers of claims for property damage that arise from a contractual provision that one party procure property insurance on such property are not

15

impacted by other contractual provisions requiring the procurement of liability insurance. This applies even if the scope of one coverage overlaps with another. *See e.g. Haemonetics Corp. v. Brophy & Phillips Co. Inc.*, 501 N.E.2d 524, 526 (Mass. App. 1986) (enforcing a waiver of subrogation provision even though the insurance the owner chose to procure may have been more extensive than what was required under the contract); *Walker Engineering, Inc. v. Bracebridge Corp.*, 102 S.W.3d 837, 843-844 (Tex. App. 2003) (concluding that procurement of excessive coverage did not change the waiver of subrogation).

Defendants also argue that a wide variety of claims could arise triggering liability insurance coverage that have nothing to do with damage to the premises. For example, most construction contracts impose on one party, typically the owner, the duty to obtain builder's risk insurance on the structure being built, while at the same time imposing on the contractor obligations to procure liability insurance naming the owner as an additional insured. Similarly, commercial leases typically allocate to either the landlord or tenant the obligation to procure property insurance on the building being leased, while simultaneously imposing obligations to procure liability insurance protecting the parties against the myriad of claims that may rise. In all of these situations, the mutual benefit derived by the property insurance that one party is contractually required to obtain is never lost simply because the contracting parties also allocated responsibilities with respect to procuring liability coverage. Piecing this together, Defendants argue that General Marine was obligated to look to the property insurance it agreed to obtain pursuant to the Lease to satisfy damages to the premises and, as a result, could not have

16

reasonably relied to its detriment on any representation regarding the availability of liability coverage in the Certificate.

"Subrogation is defined as 'the principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured with respect to any loss covered by the policy.'" *N. River Ins. Co. v. Snyder*, 2002 ME 146, ¶ 4, 804 A.2d 399 (quoting BLACK'S LAW DICTIONARY 1440 (7th ed. 1999)); *see also Unity Tel. Co. v. Design Service Co.*, 160 Me. 188, 192, 201 A.2d 177, 179 (Me. 1964) ("In general terms and as applied to our present problem, subrogation is frequently referred to as a 'doctrine of substitution' and may be defined as the substitution of one person in the place of another with reference to a lawful claim"). "A waiver of subrogation is a provision by which parties to a contract relieve each other of liability to the extent each is covered by insurance, thereby shifting the risk of loss to an insurer." *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 13, 868 A.2d 220. In other words, an "insured may defeat [an] insurance company's rights of subrogation by entering into an agreement of release with the wrongdoer before the policy is issued, or…after the policy is issued, but prior to loss," which is referred to as a waiver of subrogation. *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 13, 756 A.2d 515 (quoting *Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 994 (Me. 1983)). Under Maine law, waiver of subrogation clauses "have been liberally construed." *See Willis Realty Assocs. v. Cimino Constr. Co.*, 623 A.2d 1287, 1288 (Me. 1993).

A waiver of subrogation may be found even if the contract does not contain an express "waiver of subrogation provision. *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 15, 756 A.2d 515. Indeed, "the majority of cases rely on the presence of the

17

insurance procurement clause alone to establish that the risk of loss has been contracted away by the parties." *Id.* (citations omitted). The rationale behind this approach is that:

> [I]f the parties contracted for the provision of insurance, they must have done so in order to avoid both parties having to face potential liability for the same risk; It is economically inefficient for both parties to insure against the same risk. Specifically, recognizing that a property owner can always acquire insurance such as fire insurance on its own, courts have reasoned that the explanation for a provision requiring such in a construction contract is an intention on the part of the parties to relieve each other of liability and look to only one insurer to bear the risk of fire instead.

*Id.* at ¶ 16 (citation omitted). Furthermore, "[b]y agreeing to carry a particular type of insurance, an owner has agreed to look solely to the insurer and releases the [tenant] from responsibility when there is loss or damage flowing from the insured risk; because the insurer can only succeed to those rights possessed by its insured, it has no right to recover from the [tenant]." *Id.* at ¶ 17 (holding that the owner's insurer could not recover from a contractor because the owner, "by agreeing to provide fire insurance…waived any right to recover from [the contractor] for a loss from fire allegedly caused by [the contractor].").

The Law Court elaborated upon the rationale behind implied waivers of subrogation in *N. River Ins. Co.*, 2002 ME 146, 804 A.2d 399. In that case, the Law Court determined that, for residential tenants, a tenant may not be held liable in subrogation to the insurer of the landlord for damages paid as a result of fire, absent an express agreement providing that the tenant is liable in subrogation for fire damage to the building. *Id.* ¶ 1. The rationale supporting this ruling was advanced by *DiLullo v. Joseph*, which held, under a commercial lease, that allocating responsibility to the tenant to maintain sufficient insurance in anticipation of a subrogation claim is untenable and

18

would result in economic waste. *Id.* ¶ 15 (discussing *DiLullo*, 259 Conn. 847, 792 A.2d 819, 822-23 (Conn. 2002)). Stated differently, holding otherwise would require two policies of insurance to be purchased for the same insurance interest, with the waste compounded by the number of tenants on the premises. *Id.* (quoting *DiLullo*, 792 A.2d at 823). Although *N. River Ins. Co.* involved residential, not commercial tenants, it highlights the fact that the enforcement of implied waivers of subrogation is strongly influenced by the policy of avoiding economic waste via the procurement of duplicative insurance policies.

Similarly, in *Reliance Nat'l Indem.*, the Law Court explained that "waivers of subrogation are encouraged by the law and serve important social goals: encouraging parties to anticipate risks and to procure insurance covering those risks, thereby avoiding future litigation, and facilitating and preserving economic relations and activity." 2005 ME 29, ¶¶ 1, 13, 868 A.2d 220 (quoting *Buck Constr. Co.*, 2000 ME 154, ¶ 18, 756 A.2d 515). In reiterating the rationale behind the rule, *Reliance Nat'l Indem.* further refused to carve out a public policy exception to the enforceability of waivers of subrogation when the tortfeasor-policyholder's willful and wanton misconduct violates a positive statutory duty. *Id.* at ¶¶ 13, 17-20. This was because waivers of subrogation: 1) provide the important benefit of deterring litigation among parties to complicated construction contracts; and 2) have a beneficial economic effect by helping parties avoid the higher costs that result from having multiple insurance policies and overlapping coverage. *Id.* at ¶¶ 18-19.

Here, the Lease contains two insurance procurement clauses that respectively require: 1) General Marine to procure "hazard insurance with extended coverage on the

19

buildings and improvements exclusive of land, excavation, foundations and all other items normally excluded…"; and 2) Down the Bay to "maintain and carry throughout the term of this Lease and any extensions thereof commercial general liability insurance coverage in standard form with Broad Form coverage endorsement" that indemnify General Marine and/or Down the Bay "against all claims and demands for…damages to or destruction or loss of property in about the demised premises with minimum coverages of…Five Hundred Thousand Dollars ($500,000.) with respect to damage to property."

The determination of whether a waiver of subrogation has taken place ordinarily occurs when an insurer seeks to step into the shoes of its policyholder and recover from the party that contracted with its policyholder. In that case, the party allegedly at fault argues a waiver of subrogation took place that shields the party against liability from its contracting party and the contracting party's insurer. In the present case, the Defendants—not the contracting policyholders—are attempting to use the alleged waiver of subrogation as a means to limit and/or negate the coverage available for the vandalism damages. The Defendants have not, however, cited any authority in which a waiver of subrogation has been used in this manner, nor has the court's research revealed any.

The strongest argument for finding that General Marine waived its right to proceed against the Defendants is that, pursuant to *Buck Construction Co.*, if Down the Bay had raised the contractual waiver argument Defendants are asserting in the suit General Marine brought against it, Down the Bay would have likely succeeded. 2000 ME 154, 756 A.2d 515. This is because General Marine agreed with Down the Bay to purchase "hazard insurance with extended coverage on the buildings and improvements" (The Lease, p. 16 § 15.B.), and in fact procured insurance that provided coverage for

20

damage to the premises at issue. (*See* Def.s' S.M.F. ¶ 14.) Down the Bay, on the other hand, agreed with General Marine to purchase "commercial general liability insurance coverage." (The Lease, pp. 5-6, § 8.) Commercial general liability insurance policies are typically designed to protect business owners against liability to third-parties, *not* for damage to the business owner's own property. *E.g.* 3-16 Appleman on Insurance § 16.02[3][a][i] (2d ed. Sup. 2015.). In other words, Down the Bay and General Marine contracted for Down the Bay to purchase insurance protecting against injuries suffered by third parties and for General Marine to purchase insurance protecting against injuries to the property itself. With this recognition in mind, *Buck Constr. Co.* arguably favors an interpretation of the Lease whereby the parties, in an effort to be economically efficient, contracted for General Marine to purchase insurance covering the risk of damage to the premises and, as a result, waived their right to seek satisfaction against the other for said damages. *See* 2000 ME 154, ¶¶ 15-16 756 A.2d 515 (recognizing that when parties contract for the provision of insurance, it is not economically efficient for both parties to insure against the same risk).[2]

This argument, however, ignores the fact that waivers of subrogation are intended to protect the contracting parties, not their insurers, against liability stemming from a risk that the parties agreed to insure against. By contracting for the provision of insurance, the parties are presumed to have placed the risk of loss—caused by either party—on the insurers. *Buck Constr. Co.*, 2000 ME 154, ¶ 16, 756 A.2d 515. Stated differently, in order to maximize economic efficiency and avoid duplicative coverage, the parties have

---

[2] Although not raised by the parties, or made clear by the summary judgment record, Defendants' argument is weakened by the fact that they presumably would have had the opportunity to raise this argument in General Marine's suit against Down the Bay had they agreed to defend Down the Bay.

21

divvied up the responsibility for insuring against certain risks. *Id.* As a result, waivers of subrogation are designed to promote economic efficiency for the contracting parties, *not* as a means to limit the coverage available under a particular insurance policy provided to one—or both—of the contracting parties.

Furthermore, the twin policy objectives behind enforcing waivers of subrogation are, at least, less forceful in the present case. First, the goal of promoting economic efficiency is undermined because General Marine and Down the Bay contracted for the duplicative coverage the doctrine seeks to avoid. Specifically, the parties agreed that Down the Bay would—and did in fact—purchase commercial general liability insurance that protected itself *and* General Marine as an additional insured. *See N River Ins. Co.*, 2002 ME 146, ¶¶ 15-16, 804 A.2d 399. Second, the goal of minimizing litigation would not be as strongly promoted because the precise litigation the doctrine seeks to avoid— i.e. the suit General Marine brought against Down the Bay—already occurred. *See Reliance Nat'l Indem.*, 2005 ME 29, ¶¶ 1, 13, 868 A.2d 220.

In addition, while the parties contracted for General Marine to purchase insurance covering damage to the property, the record indicates that Down the Bay purchased a commercial general liability policy whose Certificate represented that it provided coverage for "DAMAGE TO RENTED PREMISES." In other words, even though Down the Bay was not required to purchase a policy protecting against damage to the premises under the Lease—or at least representing in its certificate that it provided said protection—Down the Bay did, in fact, purchase the Acadia Policy whose Certificate

22

could reasonably be interpreted as making said representation.[3] Because General Marine is listed as an additional insured under the Acadia Policy and received the Certificate, it had a right to rely on the Certificate and the representations therein.[4]

Finally, to the extent General Marine's Complaint is based, in part, on its status as an additional insured, the doctrine known as the "anti-subrogation rule" indicates the Lease's waiver of subrogation should not be used to limit the coverage the Defendants provide. The anti-subrogation rule prevents an insurer from suing its own insured for a risk covered by the insurance policy. *Phila. Indem. Ins. Co. v. Farrington*, 2012 ME 23, ¶ 5, 37 A.3d 305 (quoting 22 Eric Mills Holmes, Appleman on Insurance § 141.2(B)(2) (2d ed. 2003)). While this doctrine is intended to prevent an insurer from suing its policyholder when the policyholder caused the damage insured against, it indicates a limitation on the subrogation doctrine when it comes to an insurer's own insured—or additional insured. In other words, a waiver of subrogation is not intended to limit the

---

[3] While waivers of subrogation are designed to promote economic efficiency, the law does not mandate economic efficiency. Indeed, when multiple policies cover the same loss, insurers often work out a plan based on their respective policy language to afford coverage and/or indemnity. In the event the insurers do not reach such an agreement, they are free to pursue contribution actions against each other.

[4] General Marine's Complaint is premised on its reliance on the alleged misrepresentation that the Acadia Policy covered the vandalism damages. It is unclear, however, whether General Marine is bringing suit based on the Defendants' failure to pay the judgment General Marine obtained against Down the Bay in the Defendants' capacity as Down the Bay's insurer, whether General Marine is suing based on its status as an additional insured of the Defendants, or some combination thereof. (*See* Compl. ¶¶16-21.) On the one hand, the Complaint directly alleges that General Marine has demanded the Defendants pay it the damages awarded against Down the Bay. (Compl. ¶ 18.) On the other hand, the Complaint does not address the basis for that demand, and asserts that General Marine relied on the Certificates of Insurance and expectation of protection thereunder. (Compl. ¶¶ 9, 19-21.) Neither party has directly addressed this ambiguity. Viewing the allegations and facts in the light most favorable to General Marine, the court proceeds from the premise that General Marine is seeking to recover, at least in part, based on its status as an additional insured owed coverage under the Acadia Policy.

coverage the insurer contractually agreed to provide its policyholder and additional insureds. Accordingly, General Marine did not contractually waive its right to seek recovery for the vandalism damages against the Defendants based on a waiver of subrogation.

D.    Whether General Marine has Stated a Cognizable Cause of Action Based on the Defendants' Alleged Violation of 24-A M.R.S.A. § 2153

Defendants argue in a footnote that the court should grant summary judgment against Count III of General Marine's Complaint for violation of 24-A M.R.S. § 2153 because there is no private cause of action thereunder. Plaintiffs do not respond to this argument.

24-A M.R.S.A § 2153 prohibits statements that falsely advertise or misrepresent the terms of an insurance policy. Section 2153 does not, however, expressly create a private cause of action. In order to determine whether a cause of action may be implied, the court examines:

> (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one; (3) whether it is consistent with the underlying legislative scheme to imply such a remedy; and (4) whether the cause of action is one traditionally relegated to one jurisdiction rather than another.

*Goodwin v. School Admin. Dist. No. 35*, 1998 ME 263, ¶12, 721 A.2d 642.

Here, the court determines that section 2153 does not implicitly create a private cause of action because the chapter in which it is located focuses on enforcement and regulation of the insurance industry by the Superintendent of Insurance, not private parties. *See* 24-A M.R.S.A. §§ 2151-2151-B (discussing administrative hearings, and rules promulgated by the Superintendent of Insurance); *Dyer v. Superintendent of Ins.*,

24

2013 ME 61, ¶ 8, 69 A.3d 416 (discussing a petition for enforcement filed by the Bureau of Insurance based in part on the violation of 24-A M.R.S.A. § 2153). This conclusion is buttressed by 24-A M.R.S.A. § 2164-D, which is located in the same chapter as section 2153 and expressly provides that it does not create a private cause of action for, among other things, an intentional misrepresentation to claimants and policyholders regarding the terms of a policy. 24-A M.R.S.A. § 2164-D(3)(A), (8). Accordingly, summary judgment is warranted against Count III of the Complaint because 24-A M.R.S.A. § 2153 does not authorize a private cause of action thereunder.[5]

The entry will be:

The Court **denies** Defendants' motion for summary judgment against Counts I, II, and IV of General Marine's Complaint.

The Court **grants** Defendants' motion for summary judgment against Count III of the Complaint because 24-A M.R.S.A. § 2153, on which the claim is premised, does not create a private cause of action thereunder.

Dated: November 3, 2015

_____
Justice Michaela Murphy
**Business and Consumer Docket**

This order is to be incorporated on the docket for this case by reference.

Entered on the Docket: 11/3/15
Copies sent via Mail___ Electronically _✓_

---

[5] While Defendants' alleged misrepresentation could support a private cause of action pursuant to 24-A M.R.S.A. § 2436-A(1)(A), General Marine has not offered this basis for its claim or disputed that Count III is premised on a violation of Section 2153.

25

General Marine
Construction Corporation,
**Plaintiff**
v.                                                    DOCKET NO. BCD-CV-2015-18

Acadia Insurance Group, LLC

and

Desmond and Payne, d/b/a
Cross Insurance -Portland
**Defendants**


General Marine                          John Bass, Esq.
Construction Corporation,               120 Exchange St. 6th Floor
                                        PO Box 447
                                        Portland, ME 04112-0447


Acadia Insurance Group, LLC and         James Poliquin, Esq. &
Desmond and Payne, d/b/a                Benjamin Donahue,vEsq.
Cross Insurance -Portland               Two Canal Plaza
                                        P.O. Box 4600
                                        Portland, ME 04112-4600